The opinion of the Court was delivered by
Ing-lis, J.
When property has been settled to the separate use of a feme, whether sole or covert at the time, in terms and under circumstances which evince an intention so to extend the effect, it will, by such settlement, be secured *154 against the marital rights of each one of as many husbands as she shall successively take. During each interval of dis-coverture, the property will, indeed, be absolutely subject to her control and disposition, and, by her own act for that purpose, may be aliened as if no such trust existed, but upon each coverture, as it occurs, the " separate use” will revive and attach upon the property, or upon so much thereof as has not been by her, while discovert, so disposed of. (Nix vs. Bradley, 6 Rich. Eq. 43; Tullet vs. Armstrong, 1 Beav.1, & 4 M. & Cr. 390; Scarborough vs. Borman, 1 Beav. 34; 4 M. & Cr. 377; Davies vs. Thornycroft, 6 Sim. 420; Gaffee's Settlement, 14 Jur. 277; 1 Mac. & Gord, 541; 1 Wh. & Tud. Lead. Cas. Eq. 341-5.) The Chancellor has, therefore, correctly indicated that, in every such controversy as the present, the question to be resolved is: What was the intention of the settlement ?
If the subsequent acts and declarations of the parties could be permitted to ascertain the intention in this behalf with which a settlement was executed, there would seem to be left little room to doubt that the operation of the deed of December 10, 1850, which is the subject of the present controversy, was meant to be confined to the particular marriage then in contemplation. The plaintiff, Eliza Ann, to whom the legal estate in the settled property belonged, avers in her bill, in direct contradiction of the claim which the suit prefers, that she “ supposed that at the death of her former husband, the said James L. Mouzon, the legal effect and virtue of the said deed was at an end;” “ that she was under the impression that the marriage-settlement ceased to operate, after the death of the said James L. Mouzon, upon all the property which she had in her possession which was not included in the inventory of the estate of her first husband.” And in exact conformity with this understanding of the extent of what she had, by her said deed, accomplished, she is found, within six months after *155 the decease of the husband, Mouzon, in immediate contemplation of her intermarriage with, whom the settlement had been executed, taking from the trustee under that settlement an account which embraced the exact period of the coverture up to its close, and granting him a final acquittance and discharge. The legal effect of this discharge is not now under consideration. The trustee also, another party to the deed, and a defendant in this cause, in his answer insists that “the said deed had no further force and effect after the death of the said James L. Mouzon.” And the significant fact, in exposition of what these parties intended to do, and of their understanding of what they had done, is that, from the determination of that coverture until the present time, the trustee under the deed has never acted in the. execution of the trust, nor in anywise, in fulfilment of the duties thereof, intermeddled with the settled property, and, until the origin of this litigation, has never, so far as appears, been called upon so to do, by the cestui que use, who was also herself the creator of the trust. It is thus made very clear, in point of fact, that the parties to the deed of December 10,1850, intended that the trust thereby created for the separate use of the plaintiff, Eliza Ann, should endure only while the particular coverture then in view would last, and should cease with its determination; but this does not produce judicial persuasion of the intention of the settlement.
The material inquiry is, whether this intention appears in the deed itself. This deed is the only authoritative exposition of the purpose of the parties at the time of its execution, and can alone be heard in response to the inquiry, What was the intention of the settlement f In interpreting its utterances, however, it is not inadmissible to seek assistance from the circumstances under which it was executed, and, placing ourselves in the situation in which the *156 parties were at the time, thus the more nearly realize the exact import of their words.
Eliza Ann Burgess held, under the will of her late husband, an estate for the term of her own life, in the whole residue, being the great bulk of his estate, consisting of real and personal property, which was limited in remainder at her death to certain of his kindred, and this estate, with some personal chattels, of no very great comparative value, belonging to her absolutely, constituted her whole fortune. She was about to intermarry with James L. Mouzon, who is described as “an improvident man and an insolvent,” “ largely indebted beyond his ability to pay, having little, if any, estate in his own right, and subject to the claims of creditors.” He had nothing, then, wherewith to endow her, but fortunately she needed nothing; her own was sufficient. But such a marriage, if no barrier were interposed to its legal operation, would imperil this provision for her comfort and support which the bounty of her former husband had made, and put in jeopardy the interests of his kinsfolk, who were entitled in remainder. It was reasonable that some security should be sought against such results, and all that was needed for this purpose was to exclude the legal effect of this marriage upon her property and its fruits. To divest herself of that control over and' enjoyment of these, to which her legal ownership entitled her, so far as was legally essential to this exclusion of the intended husband’s marital rights, was necessary; but no greater or more enduring fetter on that ownership was necessary, and she would not, therefore, be reasonably expected to intend more. Doing no more, when the purposes of that exclusion should be accomplished and ended, the legal proprietorship, with all its incidents, substantially and effectually, if not formally, must result to her.
Under such circumstances, the deed under consideration was executed. Does it in its terms and provisions conform *157 to the requisition which these circumstances, made upon her, or is there something in those terms and provisions which carries its operation forward beyond the immediate mischief which there was present occasion to prevent? The contemplated marriage with Mouzon, and the agreement between them upon the treaty thereof, are recited as constituting the occasion and reason for the execution of the settlement. The trust is for the separate use of the-wife, “ without being in any manner subject to the debts, contracts, control, engagements, or intermeddling of the said James L. Mouzon, his executors, administrators, or assigns, or of any other person or persons whomsoever, claiming or to claim the same or any part thereof, by, through, or under him or them" “ James L. Mouzon, for himself, &c., covenants, &e., that the said Eliza Ann, notwithstanding the said marriage, shall have, take, and. receive the rents, issues, and profits, &c., to and for her sole and separate use, &c., and the same shall be accounted, &c., as a separate and distinct estate of and from the estate of the said James L. Mouzon, and be in nowise liable or subject to him, or the payment of any of his debts.” The investment of “ the ready money accruing out of the said separate and distinct estate” is to be made “ during the said coverture," in the name of the trustee, or other person, in trust for the wife, but no direction is given for so making investments of the “ ready money” income accruing after the determination of that coverture.
The property thus acquired with the accumulated profits of the separate estate during the coverture is, upon the death of the wife, to go to the issue of this particular marriage, and if no issue, then to the said James L. Mouzon, if surviving, but no disposition is made thereof upon her death in the contingency of her surviving Mouzon, and there being no issue of the marriage; of the personal chattels owned by the feme absolutely at the execution of the *158 deed, and constituting part of the corpus conveyed thereby to the trustee, no disposition is made to take effect upon her death; and, finally, the covenant for further assurance is by the said Eliza Ann and the said James L. Mouzon. Some of these particulars standing singly might not have a very decisive significance, but standing, as they, do, around the particular coverture in contemplation, and all pointing with converging lines of indication to that cover-ture, as in the minds of the parties at the execution of the deed, they unitedly confine the intention and so the operation of the settlement to that coverture with a power difficult to be overcome. It is a settlement by a feme of her own property in immediate contemplation of a particular marriage, and rendered peculiarly necessary by the condition and habits of the intended husband ; reciting this marriage as its occasion, and professing to be in execution of one of the terms of the treaty therefor; excluding the marital rights of the particular husband by name; making provision for the contingencies of the particular coverture only; furnishing a check against the improvidence of the husband, in the motive to economy and thrift in the management and use of the income of her property, during the coverture, presented by the dedication of the savings from that income to a provision for the husband himself or the issue of his union with her, after her death; leaving all her interests in the subject-matter outside of and beyond that coverture to the protection of the powers and rights of ownership, which, upon the determination of the cover-ture otherwise than by her death, must result to her, and in no part expressly extending its terms to embrace any subsequent marriage, or affect the rights of any after-taken husband. It discloses not so much a general purpose to secure the separate enjoyment of the property to the feme, as a special purpose to protect it against the husband then to be taken.
*159 The property constituting the corpus of the principal estate is conveyed to the trustee, his executors, administrators and assigns “for and during the term of the natural life” of the feme; the trust is, of this corpus, “ to and for the sole, separate and exclusive use,” &c., of the feme, “for and during the term of her natural lifeand the new acquisitions made with the surplus profits are to be taken as the separate estate of the feme, “for and during the term of her natural life.” These provisions are supposed to manifest “ the intention of the settlement” — that the separate use should endure throughout the life of the feme, and, therefore, must exclude the marital rights of every husband afterwards taken.
The legal estate in the trustee is intended only to support the separate use, and should be large enough for that purpose. As the coverture upon which the feme was about to enter might be determined by her own death, the separate use might need to endure for the term of her' actual life. And the separate "use, even if limited to the coverture, was in legal contemplation a life-estate. In the great mass of the property constituting the corpus of the principal estate, she held only a life-estate, and she conveyed to the trustee all she had therein. If she had held a larger estate she would probably have conveyed it, either by technical description, or in general terms, without words of limitation. The legal interest of the trustee in the new acquisitions, which were to constitute the corpus of the accessory estate, is not so limited; but is general in its terms, open to be construed just so large as the necessities of the trust to be supported by it require. This circumstance does not'seem entitled to much weight.
The duration of the “separate use” might, it is true, have been limited in express words, to the continuance of the contemplated coverture, but this, as has been remarked, would have been, in the regard of the law, equivalent to an *160 estate “for the term, of her own life," because possible to endure so long, though liable to be sooner determined, by the determination of the coverture otherwise than by her death. If, therefore, the other parts and provisions of the deed clearly show, as they do here, that the separate use was intended to be confined to the particular coverture, this description of the quantity of the estate she took, under the deed to her separate use, would'not be so inconsistent as by its technical force to control such intention and extend the operation of the deed beyond that coverture. In Benson vs. Benson, 6 Sim. 201, the separate use was expressed to be “for and during the natural life" of the feme, and this was insisted on; yet the .separate use was not extended to the second coverture. So, in Knight vs. Knight, 6 Sim. 199, the trust was held to be impliedly for the life of the feme, yet the separate use was confined to the one coverture. And in each case the explanation was, that the party creating the estate seemed to have contemplated the determination of the coverture by the death of the wife alone, and not to have adverted to a determination by the death of the husband, the wife surviving. In England, the separate use is not fettered, as with us, by the disability of the feme, and an, express clause against anticipation is now usually introduced into settlements there to protect such an estate against the husband’s supposed control over the wife’s will. The creation of the separate estate and the restraint of anticipation are, therefore, two distinct things, and may or may not be commensurate. The precise question in Qaffee's case (14 Jur. 277,1 Mac. & Grord. 541) seems to have been whether, under the terms of the particular deed there, the restraint on anticipation was or was not confined to a particular coverture. It is matter of regret that access cannot be had to the report of the final hearing and judgment. It is difficult, with the facts as reported in 7 Hare, 101, to be reconciled to the conclusion which seems *161 to have been finally reached in the particular case. But the effect of the judgment, so far as it settles any principle, is represented to be, that "a restraint on the power of alienation in a settlement for the separate use of a married woman will be effectual during each and every successive coverture, whenever it is imposed in or by the clause which creates or limits the estate, and there is nothing in the rest of the instrument to warrant an opposite conclusion.” (1 White & Tudor Lead. Cas. 544, Am. Note.) And Lord Chancellor Cotten-ham is reported as saying, in delivering his judgment: “It must depend on the construction of the particular words used whether the provisions for the separate use and against anticipation are applicable to the whole of the life-estate given, or only during the then existing coverture.” (Hill on Trustees [420], Note 3.) In these propositions nothing is perceived inconsistent with the present judgment. This Court discovers no error in the judgment of the Chancellor that the separate use created by the deed of December 10,1850, is “ limited, by the proper construction of the deed, to the coverture in contemplation of which it was made.” '
Under the terms of the settlement, the issue of the marriage with Mouzon is entitled to an absolute estate in remainder upon the death of the plaintiff, Eliza Ann,.in the corpus of what has been herein called the accessory separate estate, and, in the circuit decree, the “ permanent separate estate.” This corpus is made up of the property of whatsoever kind, “ begotten, gained or made” of the profits of the principal separate estate — that is, the estate consisting of the property in existence at the execution of the deed, and conveyed therein to the trustee. The acquisitions, which thus constitute this corpus of the accessory estate, arise from investments which, under the directions of the deed, have been made or ought to have been made, of the surplus cash income or profits of the principal estate, accruing during the coverture with Mouzon, in “securities” or “property.” *162 The principal estate was a planting interest, consisting of a plantation, slaves, stock of work, animals, cattle, &c., and was, doubtless, intended to' be maintained as such. The feme, cestuy que use for life, was entitled, under the deed, “to have, take and receive the rents, issues, proceeds and profits ” for her separate use, applying the same to the current expenses of the estate, and to her own and, incidentally, her family’s maintenance and up-bringing according to her discretion. These “ rents, issues, profits and proceeds,” most probably, were expected to be, and were almost wholly received, enjoyed and applied in Icind, and, for the residue, according to the custom of the country, by exchanging the produce of the estate in kind for needed articles of personal or family consumption not there produced, which mode of use and enjoyment is not, in popular regard, very distinguishable from the other. If the annual issues and proceeds of the separate estate exceeded at any time these primary uses for which it was created, the excess was realized in cash, and is hence called “ready money accruing out of the said separate and distinct estate” — the yearly income not consumed in the current yearly expenses of the estate or the life-tenant, but remaining a surplus over and above these. Such “ ready money” was required by the deed to “be placed out at interest” or “invested in property.” The directions of the cestuy que use for life were to be taken and followed in the selection of securities and property, but the dedication of this surplus to investment subject to the trusts declared in the deed (and this remainder to the issue was one of them) was made by the deed itself. If there was in fact, therefore, accruing during the coverture with Mouzon, any such surplus income as has been herein indicated, any “ready money” as now defined, any yearly issues and profits not in fact consumed by the life-tenant in yearly use and expenses — this trust in favor of the issue must attach thereupon, wherever it can be fol *163 lowed, according to the principles of equity, in any property or securities in which it has been invested, and, in the absence of investment, the accumulations of such surplus profits, in whosoever hands, and in whatever form, must stand in the place of investments. The directions of the “cestuy que use for life as to the particular mode of investment might relieve the trustee from responsibility for an injury or loss resulting from such mode of investment, but the absence of such directions could not discharge any actual “ ready money” surplus from the trusts impressed upon it by the deed itself. Thus, for illustration, it may possibly be, and it seems probable even, that the balance' which was found due by the trustee upon the accounting mentioned in the bill, “foj; moneys produced by the separate estate,” and in satisfaction of which he conveyed the tract of land afterwards sold to McOlary, was such an accumulation of surplus profits or “ ready money” income. And it may be that the purchase with the income of the separate estate of articles of property, the use and enjoyment of, which does not itself consist in their consumption, as it does in the instances of articles of food and clothing, would constitute ' evidence that the income so applied was surplus in the sense here indicated, and would affect such articles of property with this trust. An inquiry by tbe Commissioner on this entire part of the case, as wide in its range as is herein indicated, is necessary, and such inquiry is hereby ordered. The details of such inquiry above adverted to for illustration, not having been discussed at the hearing, are not intended to be concluded by any thing here said, but are open for adjudication if it shall be necessary, upon exceptions on either side to such report as the Commissioner shall finally make upon the whole matter here referred for inquiry. The decree of the Chancellor, in so far as it restricts the subject-matter of the trust in favor of the issue to such part only of the income of the principal separate *164 estate as the feme, cestuy que use for life, “ chose from time to time to apply to the formation of the permanent” (called herein the accessory) “ separate' estate, as indicated by investments under her direction in the name of the trustee,” is modified in conformity with the present judgment, and in all other respects it is affirmed.
Dunkin, 0. J., and Wardlaw, A. J., concurred.

Decree modified.